J-A16015-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MATTHEW JOHN SHEFFER | : | |
| | : | |
| Appellant | : | No. 1501 MDA 2019 |

Appeal from the Judgment of Sentence Entered May 3, 2019
In the Court of Common Pleas of Centre County
Criminal Division at No(s): CP-14-CR-0000205-2017

BEFORE: PANELLA, P.J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY PANELLA, P.J.: **FILED SEPTEMBER 25, 2020**

The Court of Common Pleas of Centre County sentenced Appellant Matthew John Sheffer to an aggregate term of 20 to 40 years' imprisonment after a jury convicted him of sexually abusing his former girlfriend's 11-year-old daughter, D.N. In this appeal, Sheffer takes issue with the testimony offered by several witnesses at his trial. Those witnesses include D.N.'s grandparents, D.N.'s school guidance counselor, and Dr. Veronique Valliere, the Commonwealth's expert on sexual violence. Sheffer also alleges the verdict was against the weight of the evidence. After careful review, we conclude that Sheffer's arguments do not offer him any basis for relief and we therefore affirm his judgment of sentence.

In February 2013, after meeting A.S., D.N.'s mother, online, Sheffer moved to Maine to live with A.S. and D.N. D.N. was A.S.'s daughter from a

previous relationship with B.N., who also lived in Maine. Approximately one year after Sheffer moved to Maine, around February 2014, he, A.S. and D.N. moved to Pennsylvania. Sheffer and A.S.'s relationship ended around March 2016, and Sheffer moved out of their house about one month later.

In June 2016, D.N. went to visit her father, B.N., in Maine. During that visit, D.N. confided to her half-brother, M.F., that Sheffer had sexually abused her. M.F. told their grandparents about the abuse who, in turn, told B.N.'s fiancé about the abuse. B.N.'s fiancé told B.N. B.N. called D.N., who had returned to Pennsylvania, and persuaded her to tell A.S. A.S. reported the abuse, and Sheffer was arrested and charged with, *inter alia*, ten counts of rape of a child. Sheffer's first two trials ended in a mistrial.

The Commonwealth and Sheffer both filed pre-trial motions *in limine*. The Commonwealth filed a motion to allow the testimony of D.N.'s guidance counselor, R.M., and the trial court ultimately allowed this testimony. Meanwhile, Sheffer filed a motion to preclude the testimony of Dr. Valliere, which the trial court ultimately denied.

Sheffer's trial began on February 13, 2019, and the Commonwealth's first witness at the trial was D.N. D.N. testified that when she first moved to Pennsylvania she attended an after-school care program. However, she stopped attending that program sometime around December 2015, when she was 11 years old. Once she stopped going to the after-school program, D.N.

was often alone with Sheffer in the afternoon while A.S. was at work. D.N. testified that the two would talk and play video games.

At some point, D.N. testified, Sheffer began asking her to try on her bathing suits and her mother's clothing for him. One day, Sheffer sat down next to D.N. on her bed and touched her vagina. D.N. then described various forms of sexual abuse that Sheffer inflicted on her, including Sheffer penetrating her vagina with his penis. The abuse took place over the course of approximately four months, from some time after D.N. stopped going to the after-school care program to when Sheffer left the house in April 2016.

A.S. also testified at the trial. She testified that she met Sheffer after leaving a physically abusive relationship with D.N.'s father, B.N., and that she had sought and obtained full custody of D.N. so that she and D.N. could move to Pennsylvania with Sheffer. She stated that after she moved to Pennsylvania, she worked as an insurance auditor from nine to five on weekdays. Meanwhile, A.S. testified, Sheffer worked part-time as a server at a country club. A.S. recounted how, in late July 2016, D.N. disclosed to her that Sheffer had sexually abused her and that A.S. reported that abuse to the authorities the next day. A.S. told the jury that she and D.N. moved back to Maine in August 2016.

The Commonwealth also called D.N.'s grandparents, B.N., M.F., as well as R.M., D.N.'s guidance counselor, to the stand. Two experts also testified for the Commonwealth. Pediatrician Dr. Kristie Kaufman testified about the

results of the physical exam she performed on D.N. after A.S. reported the abuse. Dr. Valliere testified generally about the dynamics of sexual abuse, victim responses to sexual abuse and the impact of sexual abuse on victims.

The defense called M.L., Sheffer's brother-in-law, to testify. M.L. testified that he and Sheffer were trying to start a business together and he was therefore often in the garage at Sheffer's house during the period of time D.N. testified the abuse occurred. According to M.L., he never heard or saw anything inappropriate between Sheffer and D.N. Sheffer testified on his own behalf, denying that he had sexually assaulted D.N.

Following the three-day trial, the jury convicted Sheffer on all counts, which included ten counts of rape of a child, one count of involuntary deviate sexual intercourse, three counts of aggravated indecent assault of a child and fourteen counts of indecent assault of a child. The court sentenced Sheffer to an aggregate term of 20 to 40 years' imprisonment.

Sheffer filed a post-sentence motion, which the trial court denied. Sheffer filed a notice of appeal[1] and complied with the trial court's directive to

---

[1] Sheffer filed his post-sentence motion on May 9, 2019. The trial court's order denying that post-sentence motion was not entered until September 10, 2019, four days after the 120-day period allotted for ruling on post-sentence motions. **See** Pa.R.Crim.P. 720(B)(3)(a). However, Sheffer filed his notice of appeal on the same day as the order denying his post-sentence motion was entered, so we discern no issue with the timeliness of his appeal. **See** Pa.R.Crim.P. 720(A)(2)(b) (stating that if a defendant files a timely post-sentence motion, a notice of appeal must be filed within 30 days of the entry of the order denying the motion by operation of law).

file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. The court issued a Pa.R.A.P. 1925(a) opinion responding to Sheffer's statement, and we now consider the issues Sheffer raises in his appeal to this Court.

At their core, Sheffer's first three claims challenge the trial court's rulings on the admissibility of evidence at his trial. A trial court's decision to admit or exclude evidence will only be reversed on appeal if the trial court abused its discretion in making that decision. **See Commonwealth v. Yockey**, 158 A.3d 1246, 1254 (Pa. Super. 2017). An abuse of discretion is not merely an error of judgment. **See id**. Rather, an abuse of discretion only occurs when the trial court overrides or misapplies the law, or exercises judgment that is manifestly unreasonable or the result of partiality, prejudice, ill-will or bias. **See id**.

Evidence is only admissible if it is relevant, **see** Pa.R.E. 402, meaning that it logically tends to establish a material fact or tends to support a reasonable inference regarding a material fact. **See Commonwealth v. Reid**, 811 A.2d 530, 550 (Pa. 2002). However, a trial court may exclude evidence even if it is relevant when it determines, in its discretion, that the probative value of the evidence is outweighed by the danger that the evidence may, *inter alia*, cause unfair prejudice, confuse the issues, mislead the jury, or needlessly present cumulative evidence. **See** Pa.R.E. 403 ("Rule 403").

**Grandparents' Testimony**

Sheffer first alleges that the trial court abused its discretion by allowing D.N.'s grandparents to testify because he believes their testimony amounted to double hearsay. He further asserts that even if the testimony did not constitute hearsay, the trial court should have precluded it pursuant to Rule 403 for multiple reasons. None of these claims have merit.

On the second day of Sheffer's trial, the Commonwealth made an oral motion requesting that the trial court allow D.N.'s grandparents to testify. The grandparents would testify that M.F. told them about D.N.'s disclosure that Sheffer had abused her. In support of its motion, the Commonwealth explained that it wanted to present the grandparents' testimony to rebut the defense's theory that B.N. had prompted D.N. to falsely accuse Sheffer of the sexual abuse. The Commonwealth wanted to show that the grandparents were part of the chain of D.N.'s disclosure, and that the chain did not originate with B.N. The court granted the motion and in doing so, rejected Sheffer's argument that this testimony was inadmissible hearsay. However, the court specifically limited the grandparents' testimony to the fact that "they were in the chain and passed [D.N.'s disclosure of abuse] on." N.T. Trial, 2/14/19, at 9.

Sheffer first claims that the trial court abused its discretion by allowing this testimony because it was double hearsay. However, as the trial court found, the grandparents' testimony was not hearsay at all as it was not offered to prove the truth of the matter asserted, *i.e*. that Sheffer, in fact, abused

D.N. **See** Pa.R.E. 801(c) (defining hearsay as a statement, other than the one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted).

Instead, the testimony was offered to demonstrate that the grandparents were part of the chain of disclosure, *i.e.* D.N. told M.F. who told the grandparents, and to show what the grandparents did with that information, *i.e.* the grandparents told B.N.'s fiancé who then told B.N. As such, we see no abuse of discretion in the trial court's conclusion that the grandparents' testimony did not constitute hearsay. **See Commonwealth v. Wade**, 226 A.3d 1023, 1033 (Pa. Super. 2020) (stating that a statement introduced to explain a witness's course of conduct is not hearsay); **Commonwealth v. Busanet**, 54 A.3d 35, 68 (Pa. 2012) (holding that a witness's testimony that another individual told him and the defendant that the victim had robbed the individual was not hearsay when it was not offered to show that the robbery occurred but to show only that the statement had been made to the defendant and motivated the defendant to act).[2]

---

[2] In support of his position, Sheffer cites a United States Supreme Court case from 1813, **Queen v. Hepburn**, 11 U.S. 290 (1813), and claims that "it is difficult to find a case more on point than **Hepburn**." Appellant's Brief at 26. We do not agree. **Hepburn** was a case initiated by a slave seeking emancipation under a Maryland law that allowed slaves to prove that an ancestor had been emancipated. Relevant to Sheffer's argument, the **Hepburn** Court overruled a Maryland law allowing hearsay in support of a petitioner's claim for freedom based on "an ancestor who had been dead for a great length of time." **Id**. at 298 (Duvall, J., dissenting). We fail to see how

Sheffer further alleges that, even if the testimony was not hearsay, it should not have been admitted pursuant to Rule 403 because it was cumulative, distracted the jury, and was unduly prejudicial. In the first instance, it is questionable whether any of these claims were properly preserved as Sheffer only asserted in his 1925(b) statement that the grandparents' testimony, if not hearsay, was irrelevant and improperly bolstered the credibility of the witnesses. *See Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998) (holding that issues not raised in a 1925(b) statement are waived). Regardless, the claims are devoid of merit as none of them demonstrate that the trial court abused its discretion in admitting the grandparents' testimony.

Sheffer argues that the trial court should not have admitted the grandparents' testimony pursuant to Rule 403 because it was merely cumulative of M.F.'s testimony that he told his grandparents about D.N.'s disclosure and B.N.'s testimony that he learned about the allegations from his fiancé who had learned of them from his parents. We disagree.

Under Rule 403, a trial court may, in its discretion, preclude relevant evidence if its probative value is outweighed by the danger of *needlessly* presenting cumulative evidence. *See* Pa.R.E. 403. Here, as the

---

*Hepburn* undermines our conclusion that the trial court did not abuse its discretion in finding that D.N.'s grandparents' testimony was not hearsay in circumstances vastly different from those in *Hepburn*.

Commonwealth points out, "due to [Sheffer] claiming said disclosure was a result of [B.N.] forcing [D.N.] to make it up while on a visit to Maine, it was important to fully flesh out the circumstances surrounding the disclosure." Commonwealth's Brief at 30-31. As the grandparents were a distinct part of the chain of disclosure, and their testimony was brief and limited to describing their part in how D.N.'s disclosure ultimately came to light, we do not agree with Sheffer that the grandparents' testimony was needlessly cumulative.[3]

Sheffer goes on to argue, however, that the grandparents' testimony and "hearing [D.N.'s] accusations voiced over and over again" caused undue prejudice because of the phenomenon known as "illusory truth," which causes a person to be more likely to believe something the more times they hear it. Appellant's Brief at 34. It does not appear that Sheffer ever asserted the applicability of this phenomenon before the trial court and it is arguably also waived for that reason. *See* Pa.R.A.P. 302(a) (stating that issues not raised in the lower court are waived). In any event, the grandparents did not testify about the specific content of D.N.'s allegations at all. Rather, they only testified about how they became aware of those allegations and what they

_____

[3] Even if we were to agree with Sheffer that the grandparents' testimony was improperly admitted because it was cumulative, we would find that any error in the admission of this testimony was, at most, harmless for the very reason that it was cumulative. *See Commonwealth v. Chmiel*, 889 A.2d 501, 521 (Pa. 2005) (harmless error exists when challenged testimony is merely cumulative of other untainted evidence).

proceeded to do with that information. Accordingly, Sheffer's claim is simply not supported by the record.

Sheffer's assertion that the grandparents' testimony also distracted the jury from the main issues of the case is likewise not supported by the record. Sheffer maintains that "the only purpose served by the grandparents' testimony was enabling the jury to see how the entire family had been hurt by this alleged act." Appellant's Brief at 32. However, neither grandparent testified to this effect at trial or was ever asked about the emotional impact the allegations had on their family. As with Sheffer's other claims challenging the testimony of D.N.'s grandparents, this claim warrants no relief.

## Guidance Counselor's Testimony

Next, Sheffer argues the trial court erred by allowing the testimony of D.N.'s guidance counselor, R.M., on multiple grounds. According to Sheffer, the trial court should have excluded R.M.'s testimony under Rule 403 because it confused the issues, misled the jury and was unfairly prejudicial. These claims all fail.

At trial, R.M. testified that she was D.N.'s guidance counselor at D.N.'s elementary school in Pennsylvania. R.M. testified that D.N. had a difficult time acclimating to her new school when she arrived in the fourth grade, but that she was more adjusted in the fifth grade and in the first half of sixth grade. However, R.M. testified that D.N. became very agitated starting in January 2016, or what was the second half of D.N.'s sixth-grade year. D.N. would not

tell R.M. what was wrong. R.M. testified that around April 2016, D.N. was angry that she may not be able to move back to Maine, which R.M. testified was a change from D.N.'s previous disclosures in fourth grade that she did not want to go back to Maine.

R.M. also testified that D.N. never told her that she was being abused. R.M. admitted that she did not report any abuse during the time D.N. was at her elementary school because she did not have any specific evidence of abuse. However, R.M. testified that she was moved to report her observations about R.M.'s behavior to the police after she read a newspaper article about this case in August of 2018.[4]

Sheffer first asserts that the trial court should have excluded R.M.'s testimony as it was so speculative that it caused the jury to confuse the issues. Sheffer maintains that, although R.M. testified that D.N. was agitated during the time of the alleged abuse, D.N. could have been agitated for any number

---

[4] As the trial court explained:

> [R.M.] contacted authorities when she read about the charges having been filed against Mr. Sheffer regarding an unnamed girl at her school district. What caught her attention was the timeframe in which the alleged abuse was to have occurred as well as the fact that the child had allegedly moved back to Maine from Pennsylvania. She recalled her interactions with the complainant during the timeframe and was sufficiently moved by their significance that she felt it important to contact the Pennsylvania State Police.

Trial Court Opinion, 10/31/19, at 4 (unpaginated).

of reasons and the jury was left to "speculate as to the reason for such agitation and infer abuse." Appellant's Brief at 38. This claim warrants no relief.

Sheffer relies on **Commonwealth v. Douglass**, 588 A.2d 53 (Pa. Super. 1991) to support his contention. In **Douglass**, a school principal was charged with simple assault after excessively paddling a seven-year-old student. In an attempt to establish that independent factors contributed to the student's mental distress following that paddling, the principal sought to introduce evidence that the student's mother used drugs. The trial court ruled that this evidence was inadmissible. In concluding that the trial court had not abused its discretion in precluding the evidence, this Court specifically noted that the nexus between the mother's drug activity and the student's fear of the principal following the paddling was tenuous at best. **See id**. at 58.

Sheffer asserts R.M.'s testimony should have been excluded because it was "akin to the mother's drug use in **Douglass**." Appellant's Brief at 40. We do not agree. If anything, we find that **Douglass** actually supports the trial court's decision to allow R.M.'s testimony. The jury in the instant case, like the jury in **Douglass**, could have reasonably inferred that the victim's emotional distress was related to the abuse. As the trial court below reasoned, R.M.'s testimony "about the change in [D.N.'s] behavior, as well as her change in desire to move to Maine, was consistent with the timeline of abuse which she had disclosed." Trial Court Opinion, 10/31/19, at 5 (unpaginated). The

trial court therefore found that the testimony was proper circumstantial evidence of the abuse, and that it was up to the jury to place whatever weight on that testimony as it deemed fit.[5] We see no abuse of discretion in this determination.

Sheffer also contends that R.M.'s testimony misled the jury because of "the phenomenon in psychology known as hindsight bias [, which] … pertains to the overestimation that people make about their ability to have predicted something after they discovered it."  Appellant's Brief at 42. Sheffer appears to contend that R.M. suffered from hindsight bias because she did not suspect D.N. had been abused until after she read the newspaper article and this insight, Sheffer maintains, is "indicative of hindsight bias in action." *Id*. at 44. This claim also offers no basis for relief.

In the first place, Sheffer does not direct this Court to any part of the record where he raised this "hindsight bias" claim before the trial court. *See* Pa.R.A.P. 302(a) (providing that issues not raised in the lower court are waived). In any event, as the Commonwealth points out, R.M. admitted to the jury during cross-examination that she did not report her observations about D.N.'s behavior to the police until after she read the newspaper article in August 2018. The jury was therefore aware of these circumstances when determining the weight it deemed appropriate to give to R.M.'s testimony.

_____

[5] As both the trial court and Commonwealth noted, Sheffer was free to cross-examine R.M. about the possible alternative reasons for D.N.'s agitation.

While Sheffer laments that the jury was misled because it "had no reason to be aware of the hindsight bias phenomenon," he does not argue that he made any attempt to offer any evidence about, or otherwise introduce, this phenomenon to the jury. Appellant's Brief at 42. Moreover, as the Commonwealth notes, "the notion that 'hindsight is 20/20,' which is essentially what [Sheffer] is referring to, is a well-known concept and falls well within the purview of a lay jury to understand and apply when judging the credibility and weight of the guidance counselor's testimony." Commonwealth Brief at 44. No relief is due.

Sheffer also appears to assert that the trial court erred by not conducting a Rule 403 balancing test on the record. According to Sheffer, "if no balancing test was conducted, then there was no determination that the probative value of the guidance counselor's testimony outweighed the unfair prejudice to Mr. Sheffer." Appellant's Brief at 47. This claim also fails.

As a threshold matter, Sheffer did not raise this claim in his 1925(b) statement and it is waived for that reason. **See Lord**, 719 A.2d at 309. Even if Sheffer had properly preserved this issue for our review, he does not point to any case law from this Commonwealth requiring a trial court to conduct a Rule 403 balancing test on the record before it deems evidence admissible. Instead, Sheffer cites several cases from the Third Circuit to support his proposition that it must be apparent from the record that the trial court conducted a Rule 403 analysis.

Of course, we are not bound by federal circuit court decisions. ***See Wenk v. State Farm Co***., 228 A.3d 540, 550 n.9 (Pa. Super. 2020). Moreover, as even Sheffer acknowledges elsewhere in his brief, the federal counterpart to Pennsylvania's Rule 403 does not incorporate the same standard as the one in our state's Rule 403. ***See*** Comment to Pa.R.E. 403 ("Pa.R.E. 403 differs from F.R.E. 403"). Regardless, in rejecting the same argument as the one advanced by Sheffer here, our Supreme Court stated:

> Appellant is entitled to no relief resulting from the trial court's failure to articulate its balancing test on the record. We presume that the trial courts know the law, and there is nothing in this record to suggest that this trial court did not understand its duty to weigh the evidence in accord with the Rules of Evidence. Such weighing and the general consideration of the admissibility of evidence is a discretionary ruling which trial courts routinely engage in mentally. There is no requirement that it record these mental deliberations on the record.

***Commonwealth v. Hairston***, 84 A.3d 657, 667 (Pa. 2014).

Accordingly, Sheffer's claim that R.M.'s testimony was inadmissible because the trial court did not conduct a Rule 403 balancing test on the record, even if not waived, offers him no basis for relief.

### Dr. Valliere's Testimony

Sheffer argues that the trial court abused its discretion by allowing Dr. Valliere's testimony because it went beyond the parameters allowed by 42 Pa.C.S.A. § 5920 in several different ways. None of these claims warrant any relief.

Section 5920, pursuant to which Dr. Valliere testified, is a statutory rule of evidence that permits qualified experts to testify in certain criminal proceedings about the general dynamics of sexual violence, victim responses to sexual violence, and the impact of sexual violence on victims. *See* 42 Pa.C.S.A. § 5920 (b)(1). Section 5920 permits experts to testify as to their "opinions regarding specific types of victim responses and victim behaviors." *Id*. at § 5920(b)(2). However, Section 5920 specifically prohibits experts from offering their opinion on the credibility of any witness, including the victim. *See id*. at § 5920(b)(3).

Sheffer first argues, in essence, that Dr. Valliere's testimony violated Section 5920's prohibition against giving credibility opinions because her testimony improperly vouched for D.N.'s testimony. While Sheffer acknowledges that Dr. Valliere never offered an explicit opinion as to whether D.N. was credible, Sheffer nonetheless contends that Dr. Valliere improperly bolstered D.N.'s credibility by portraying D.N.'s behavior as that exhibited by a "normal, true sexual assault victim." Appellant's Brief at 53.

In support of his claim, Sheffer identifies certain portions of Dr. Valliere's testimony about general victim behavior which he believes served to implicitly bolster D.N.'s credibility. Specifically, Sheffer points to Dr. Valliere's testimony that: sexual abuse victims commonly provide gradual or piecemeal disclosure; sexual abuse victims will likely remain attached to the perpetrator during the time they are being abused; and sexual abuse victims generally do not

immediately disclose the abuse but rather, delay their disclosure. All of these topics fall squarely within the category of testimony permissible under Section 5920(b)(2).

Sheffer complains, however, that because D.N.'s testimony at trial revealed that she disclosed the abuse in a piecemeal fashion, continued to have a relationship with Sheffer throughout the abuse, and did not disclose the abuse until a few months after it ended, Dr. Valliere's testimony regarding how victims generally behave basically had the same effect as if she had told the jury that D.N. behaved like a typical sexual abuse victim and therefore actually was one. We do not agree.

Contrary to what Sheffer suggests, Dr. Valliere never explicitly addressed whether Sheffer abused D.N., testified as to how D.N. in particular reacted to being abused, or expressed any opinion regarding the overall truthfulness of D.N.'s testimony. In fact, Dr. Valliere made it clear to the jury that she had never spoken to D.N., that she did not have any opinion about this particular case, and that she was not in any way evaluating either "this defendant or this victim." N.T. Trial, 2/13/19, at 155; *see also id*. at 142-143. The fact that D.N. exhibited the same behaviors as those which Dr. Valliere testified are generally seen in sexual abuse victims simply does not translate into Dr. Valliere improperly offering her opinion about the credibility of D.N. in particular. *See Commonwealth v. Cramer*, 195 A.3d 594, 608 (Pa. Super. 2018) (holding that the testimony regarding general victim

responses given by the expert, also Dr. Valliere, did not improperly bolster the victim's credibility when Dr. Valliere did not know the factual background of the allegations, only responded to the Commonwealth's general questions and did not offer any opinion on the victim's credibility or whether the victim's particular responses to the particular assault in that case were normal).

Moreover, the trial court gave the jury an instruction on expert testimony and in doing so, specifically mentioned Dr. Valliere's testimony. *See* N.T. Trial, 2/15/19, at 66. In this vein, the trial court reminded the jurors, as it had explained to them during its opening remarks, that they were the sole judges of the credibility and weight of the testimony. *See* N.T. Trial, 2/13/19, at 8-9; N.T. Trial, 2/15/19, at 67. The court continued:

> The fact that the lawyers and I may have referred to certain witnesses as experts and that the witnesses may have special knowledge or skill does not mean that their testimony or opinions are right. When you are determining the credibility and weight of an expert's testimony and opinions consider all of the factors that I described earlier that are relevant when evaluating the testimony of any witness.

N.T. Trial, 2/15/19, at 67.

Given that Dr. Valliere's testimony did not improperly vouch for the credibility of D.N., and that the jury was explicitly instructed that it was its

- 18 -

province alone to determine the credibility of each and every witness, we conclude that Sheffer is not entitled to any relief on the basis of this claim.[6]

Sheffer also contends that Dr. Valliere should not have been allowed to testify at this trial because she had previously obtained knowledge of the facts of the case when she testified at his second trial. Thus, Sheffer contends, Dr. Valliere was not the "blind" expert witness that he maintains is required by Section 5920. As a threshold matter, this issue is waived as Sheffer did not raise it before the trial court or in his 1925(b) statement. **See** Pa.R.A.P. 302(a); **Lord**, 719 A.2d at 309. Even if not waived, the claim lacks merit.

Although not expressly mandated by Section 5920, this Court suggested in **Cramer** that experts testifying pursuant to Section 5920 should not have direct familiarity with the specific facts underlying the allegations at

_____

[6] Interlaced among his argument that Dr. Valliere improperly bolstered D.N.'s credibility is Sheffer's assertion that Dr. Valliere's testimony also ran counter to the trial court's instructions. Specifically, Sheffer asserts that Dr. Valliere's testimony that "it was part of the 'process' for a complainant to at one point say something did not happen, but later on say that it did," Appellant's Brief at 57, conflicted with the court's instructions to the jury that inconsistent testimony can be used as evidence "of the truth of anything that the witness said in an earlier statement" and to "help you judge the credibility [of that witness]." N.T. Trial, 2/15/19, at 64. However, Sheffer misrepresents Dr. Valliere's testimony. When asked about a situation where a complainant says she had been abused in a particular way that she had previously said she had not, Dr. Valliere responded that "that may not be inconsistent at all. That may just be incomplete … That's why disclosure is a process. More details unfold over time." N.T. Trial, 2/13/19, at 152-153. We do not agree with Sheffer that this testimony had the effect of undermining the court's instructions to the jury about how it could properly use any testimony that it found to be inconsistent.

issue in the trial in which they are offering their general expert testimony. To that end, in support of our determination that the expert in *Cramer* had not improperly bolstered the credibility of the sexual abuse victim in that case, we stated that the "Commonwealth did not provide Dr. Valliere with a factual account of the allegations against Appellant, and she testified without knowing anything about the allegations, the Victim or Appellant in order to comply with Section 5920." *Cramer*, 195 A.3d at 608.

Sheffer alleges the same was not true in this case. In support of his argument, Sheffer notes that prior to questioning Dr. Valliere at the second trial, the Commonwealth gave Dr. Valliere some basic information about the case so that she could have some context when providing answers to the Commonwealth's general questions about victim behavior. This information included the defendant's age, that the defendant had been accused of sexually abusing his former girlfriend's 11 year-old daughter, their living arrangements, and that there was a history of domestic abuse between the victim's mother and father. However, the Commonwealth provided this same information to Dr. Valliere, without objection, before questioning her at the third trial. *See* N.T. Trial, 2/13/19, at 123-124. We agree with the Commonwealth that "providing general context to focus an expert's testimony does not negate their blind status." Commonwealth's Brief at 51.

Notably, Dr. Valliere also unequivocally testified that she had not reviewed anything about, or interviewed anyone involved, in this particular

case and knew nothing about the specific facts of this case. **See** N.T. Trial, 2/13/19, at 142, 143-145, 155. Accordingly, even if not waived, Sheffer's claim in this regard fails.

Sheffer also challenges the Commonwealth's use of hypotheticals during its questioning of Dr. Valliere because, according to Sheffer, these hypotheticals "fed the facts of the case" to Dr. Valliere in violation of Section 5920. Appellant's Brief at 58. He complains that the Commonwealth's hypothetical questions to Dr. Valliere improperly tracked the testimony of D.N. and therefore amounted to "poorly disguised attempts to have [Dr. Valliere] opine on [D.N.'s] credibility." **Id**. at 64. This claim offers no basis for relief.

This Court has held that hypothetical questions are an appropriate way to question experts, such as Dr. Valliere, who do not have personal knowledge of the facts of a case. **See Commonwealth v. Clemat**, 218 A.3d 944, 957 (Pa. Super. 2019) (stating that the Commonwealth may ask expert witnesses hypothetical questions so long as the record supports the hypothetical); **Ranieli v. Mut. Life Ins. Co**., 413 A.2d 396, 398 (Pa. Super. 1979) (stating that hypotheticals are an acceptable method of allowing experts to render opinions on facts not personally known to the expert). The Commonwealth properly used such hypothetical questions here and in fact, did so at the direction of the trial court. **See** N.T., 2/13/19, at 132.

Of course, hypothetical questions which ask or elicit testimony about the *credibility* of a child in that hypothetical scenario are not permitted under

Section 5920. ***See Commonwealth v. Leap***, 222 A.3d 386, 388 n.3, 392 (Pa. Super. 2019), *appeal denied*, 2020 WL 2465050 (Pa. May 13, 2020) (holding that expert's testimony opining about the credibility of the victim in a hypothetical was impermissible under Section 5920). The Commonwealth did not pose any such question here. Sheffer has simply not demonstrated that the trial court abused its discretion in allowing the Commonwealth to ask Dr. Valliere hypothetical questions or that those questions improperly bolstered the credibility of D.N. Instead, we agree with the trial court that Dr. Valliere's testimony was "entirely consistent with the purposes of [Section 5920] and the need to educate the jury as to the dynamics of child sexual abuse." Trial Court Opinion, 10/31/19, at 4 (unpaginated). No relief is due.

## **Weight of the evidence**

Lastly, Sheffer argues that the verdict was against the weight of the evidence because it was not grounded in logic or supported by credible evidence. This claim warrants no relief.

"The weight of the evidence is exclusively for the finder of fact who is free to believe all, part or none of the evidence and to determine the credibility of witnesses." ***Commonwealth v. Small***, 741 A.2d 666, 672 (Pa. 1999) (citation omitted). A trial court should only grant a new trial on the ground that the verdict was against the weight of the evidence when the verdict is so contrary to the evidence so as to shock one's sense of justice. ***See Commonwealth v. Chamberlain***, 30 A.3d 381, 396 (Pa. 2011). This Court's

standard of review of a trial court's decision regarding a weight of the evidence claim is limited to determining whether the trial court palpably abused its discretion in concluding that the verdict was or was not against the weight of the evidence. **See Commonwealth v. Champney**, 832 A.2d 403, 408 (Pa. 2003).

Here, Sheffer first claims that the trial court abused its discretion in finding that the verdict was not against the weight of the evidence because Dr. Kaufman, who was qualified as an expert in the examination of children who may have been sexually abused, found that the exam of D.N.'s hymen was normal. Sheffer asserts, in essence, that this lack of physical evidence of trauma rendered the verdict against the weight of the evidence because it was inconsistent with D.N.'s testimony that Sheffer had repeatedly penetrated her vagina.[7] We disagree.

Dr. Kaufman testified that she performed a genital exam of D.N. on August 1, 2016. According to Dr. Kaufman, D.N.'s exam was normal, meaning that D.N.'s hymen had no lacerations or transections. Dr. Kaufman explained

---

[7] Sheffer relies on a medical journal article, *Sexual Assault in Prepubertal Girls: It is Normal to Be Normal - Or is it: Evidence of Vaginal Penetration in Prepubertal Girls*, 52 Med.Sci. & L. 193 (2012), to support his claim. Sheffer does not point to any place in the record where he mentioned this article, submitted this article to the trial court or otherwise made it a part of the certified record. It would therefore be improper for this Court to consider it. **See Commonwealth v. Preston**, 904 A.2d 1, 7 (Pa. Super. 2006) (stating that if a document is not in the certified record, this Court may not consider it).

that it is common for the hymen of the children she is examining for reported sexual abuse to not show any injury and that in fact, 97 to 99 percent of exams are considered normal. *See* N.T., 2/14/19, at 54, 61-62. "Just to expand on that," Dr. Kaufman testified that any injuries to the hymen will typically heal within two to ten days and lacerations and transections will typically heal within one month. *Id*. at 54-55. Accordingly, Dr. Kaufman stated that if an injured hymen heals fine, the exam will be normal after one month. *See id*. at 55. In D.N.'s case, then, Dr. Kaufman testified that there was "very little" likelihood that she would have seen signs of abuse during her August 2016 exam if the abuse had ended in April. *Id*. at 55. She concluded that nothing about D.N.'s exam could confirm or rule out that sexual abuse had occurred. *See id*.

In evaluating Sheffer's weight of the evidence claim, the trial court pointed to Dr. Kaufman's testimony, and stated that contrary to Sheffer's claim, "the lack of physical evidence of sexual abuse based on an examination of the complainant's genital area is probably more common than to actually have a physical finding of sexual contact." Trial Court Opinion, 10/31/19, at 6 (unpaginated). The trial court also noted Dr. Kaufman's testimony that this lack of physical evidence could not rule out that D.N. had been sexually abused. Based on this testimony, the trial court rejected Sheffer's claim that Dr. Kaufman's exam results necessarily meant that the jury's verdict was against the weight of the evidence. We discern no abuse of discretion in this

determination. ***See Cramer***, 195 A.3d at 601 (explaining that this Court gives the highest deference to a trial court's ruling on a weight of the evidence claim as it was the trial court that heard and saw the testimony).

The remainder of arguments that Sheffer submits in support of his weight of the evidence claim are no more than challenges to the jury's assessment of the credibility of witnesses. Those arguments include Sheffer's claim that there were "multiple witnesses" contradicting D.N.'s report of sexual abuse. Specifically, Sheffer contends that he himself testified that he did not assault D.N. and that his brother-in-law corroborated this with his testimony that he never heard or saw anything suspicious, even though he was often at the house. Of course, these questions of credibility were for the jury to decide. ***See Commonwealth v. Page***, 59 A.3d 1118, 1130 (Pa. Super. 2013) (stating that issues of credibility lie within the sole province of the fact-finder and any conflict in the testimony is to be resolved by the fact-finder).

The jury clearly credited D.N.'s testimony and her testimony, as the trial court noted, was sufficient on its own to support Sheffer's verdict in this case. ***See Commonwealth v. Johnson***, 180 A.3d 474, 479 (Pa. Super. 2018) (holding that a victim's testimony alone, if believed by the fact-finder, is

sufficient to sustain a conviction).[8] We see no abuse of discretion in the trial court's finding that the verdict did not shock one's sense of justice and was therefore, not against the weight of the evidence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/25/2020

_____

[8] Sheffer also argues that the Commonwealth had no corroborating physical evidence of the abuse, and to overcome this vacuum, presented A.S.'s testimony that she saw a condom wrapper in the toilet at one point and that D.N. bled on a maxi pad. As an initial matter, as discussed above, no physical evidence was required to sustain the jury's verdict. And while Sheffer points out that he testified that, unlike A.S., he never saw a condom wrapper in the toilet, this issue clearly went to credibility. Sheffer also appears to contend that the blood on the maxi pad was not corroborating physical evidence because it was more likely evidence of A.S. getting her menstrual period rather than anything connected to an assault. However, A.S.'s testimony about the maxi pad arose during questioning about D.N.'s first period, and A.S. never testified that she believed the blood was associated with the abuse. Certainly, neither of these claims establish that the trial court abused its discretion in determining that the verdict was not against the weight of the evidence. *See Commonwealth v. Tharp*, 830 A.2d 519, 528 (Pa. 2003) (stating that a verdict is not against the weight of the evidence simply because there was a conflict in the testimony).